

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-1995

# NL Industries v Comm Union

Precedential or Non-Precedential:

Docket 94-5470

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"NL Industries v Comm Union" (1995). *1995 Decisions.* Paper 249.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/249

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 94-5470


NL INDUSTRIES, INC.

v.

COMMERCIAL UNION INSURANCE COMPANY
                    Defendant/Third-Party Plaintiff

v.

CERTAIN UNDERWRITERS AT LLOYD'S;
INSURANCE COMPANY OF NORTH AMERICA;
NORTHBROOK EXCESS AND SURPLUS INSURANCE COMPANY
                    Third-Party Defendants

Commercial Union Insurance Companies,
                    Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 90-cv-02124)

Argued:  March 7, 1995

Before:  BECKER, SCIRICA and WOOD,[0] Circuit Judges.

(Filed   September 8, 1995)

> STEVEN R. BROCK, ESQUIRE (ARGUED)
> Rivkin, Radler & Kremer
> EAB Plaza, West Tower
> Uniondale, NY   11556-0111
>
> Counsel for Appellant, Commercial
> Union Insurance Companies

---

[0] Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation.

(ARGUED)

SAMUEL   A.   HAUBOLD,   ESQUIRE

Kirkland & Ellis
200 East Randolph Drive
Chicago, IL   60601

Counsel for Appellee,
NL Industries, Inc.

(ARGUED)

TERRY   M.   COSGROVE,   ESQUIRE

Peterson & Ross
200 East Randolph, Suite 7300
Chicago, IL   60601-6969

Counsel for Appellee, Certain
Underwriters at Lloyd's of London

PAUL R. KOEPFF, ESQUIRE (ARGUED)
O'Melveny & Myers
153 East 53rd Street
Citicorp Center
New York, NY   10022

Counsel for Appellee, Insurance
Company of North America

OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal by defendant/third party plaintiff Commercial Union Insurance Company ("CU") arises out of a suit brought by plaintiff/appellee NL Industries ("NL") seeking a declaration that it is entitled to product liability insurance coverage for a large number of lawsuits alleging lead paint exposure. Jurisdiction is based on diversity of citizenship. CU appeals from the grant of summary judgment against it in order to contest: (1) the

2

district court's choice of New Jersey law and its apparently consequent summary judgment requiring CU to fund NL's defense in the underlying tort actions; (2) the court's refusal to apportion the defense costs incurred in the underlying litigation between covered and non-covered claims; and (3) its denial of CU's claim for contribution against third party defendants/appellees Insurance Company of North America ("INA"), Northbrook Insurance Company, and certain underwriters at Lloyd's of London, (the "London Insurers").

We hold that the district court erred in applying New Jersey substantive law. Under New Jersey choice of law rules, which are applicable since the case was litigated in the District Court for the District of New Jersey, see Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020 (1941), the law of the place of contracting applies unless some other state has a "dominant significant relationship" to the transaction. The policy was negotiated and signed in New York, and thus the parties reasonably expected, as the district court recognized, that New York law would govern the interpretation of the contract. Moreover, at all relevant times, the parties each had their principal places of business in New York, the premiums were paid in New York, and New York taxes were paid on the policies.

In contrast, it is patent that New Jersey has none of the contacts with or interests in the litigation that could give rise to the requisite relationship. Significantly, none of the underlying tort claims involved New Jersey plaintiffs. Because

3

the lead paint coverage actions had been joined with certain environmental coverage actions (seeking coverage for claims that NL was responsible for environmental harms at sites in New Jersey and elsewhere), the district court relied upon Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 629 A.2d 885 (N.J. 1993), as a basis for applying New Jersey law. But since that case has no application to tort-related cases, we conclude that the court was incorrect in applying it here. And while it is arguable that the states where the lead paint claims arose had a relationship to the transaction, we do not believe that they have the "dominant and significant relationship" necessary to displace the law of New York, which is the law of the place of contracting, of performance, and of the tort.

Because the district court's application of New Jersey instead of New York law to the coverage issues was legally erroneous, we must reverse the grant of summary judgment. In view of this result, we do not reach the substantive questions of CU's duty to defend, its right to allocation, or the availability of a contribution claim against INA, for on remand these must be reconsidered pursuant to New York law.

I. Facts and Procedural History

This is one of two separate declaratory judgment actions brought by NL, a New Jersey corporation with its principal place of business in New York, against CU for insurance coverage under contracts negotiated and performed in New York. NL first sought a declaration that CU was obligated to defend it in product liability lawsuits in Massachusetts, New York, and

4

Louisiana arising out of NL's manufacture of lead paint pigment. NL later added claims for coverage for four additional lead paint suits. The various plaintiffs in the underlying lawsuits alleged personal injuries as the result of lead paint exposure. NL did not, however, seek a declaration of CU's obligation to indemnify it with respect to the first three lead paint actions in this lawsuit; instead, NL included that issue in a separate lawsuit, the so-called "environmental action." See NL Industries, Inc. v. Commercial Union Ins. Co., No. 90-2125 (D.N.J.). In that action, NL also seeks a declaration that CU is obligated to defend and indemnify NL in connection with approximately 385 environmental claims arising from numerous sites throughout the United States.

The lead paint cases underlying this coverage suit arise from the use of lead paint or paint containing lead pigment manufactured by NL. The underlying complaints allege that NL knew since the early 1900's of the dangers posed by lead paints, and charge that NL "affirmatively misrepresented the safety, suitability and qualities of lead paint through [its] advertisements and promotional activities." (JA 21 at 1890-92; 1824-26; 1737-38; 1702-04.) They contain allegations of negligence, fraud, civil conspiracy, and other intentional torts. The plaintiffs also allege that NL organized the Lead Industries Association ("the LIA") to respond to the negative information being revealed about lead paint, and that NL's high-level executives played an active role in the LIA, which led an effort to discredit adverse medical evidence about the hazards of lead paint in order to ward off any additional government regulation.

5

Documentary evidence submitted by CU supports these allegations of fraud and other intentional torts. Many of the meetings organizing these activities allegedly occurred in New York.

The district court found that New York was the place of contracting for all of the policies issued to NL by CU. NL had used a New York-based insurance broker to negotiate these contracts. The contracts were countersigned in CU's New York office. During the time that the relevant CU policies were in effect, NL maintained its national headquarters and principal place of business in New York. Both NL and CU's original objectively reasonable expectations were that New York law would control any disputes involving these contracts. See 7/11/91 Op. at 10.[0] CU coded these policies as New York contracts, and premium taxes on the policies were paid in New York.

The CU policies at issue were effective from February 1, 1966 to January 1, 1978. Some policies covered the period from February 1, 1966 to February 1, 1970 and provided coverage for bodily injury only. Other policies were effective from February 1, 1970 to January 1, 1978 and covered both bodily injury and property damage claims. The insuring agreements typically state:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
> > Coverage A bodily injury or
> > Coverage B property damage

---

[0] In adopting the district court's finding about the parties' expectations, we do not consider the affidavits submitted by CU in the litigation of these four new suits, for the district court properly noted that "[t]he time for the presentation of such evidence has long passed." 5/26/94 Op. at 11.

6

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent. . . .

The policies typically define "occurrence" as follows:

an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured.

The policies provided by INA similarly specify that INA has the right and duty to defend bodily injury or property damage suits caused by an "occurrence," defined as an event that was "neither expected nor intended from the standpoint of the Insured."

In both cases involving the CU coverage, the allegations of intentional conduct would appear to put coverage at issue. In contrast, the London policies in effect from November 19, 1949 to May 1, 1970 provide for (even broader) coverage of property damage in the following terms:

COVERAGE. From and against all loss, costs, damages, attorney fees and expenses of whatever kind and nature which the Assured may sustain or incur by reason of or in consequence of:

(a) Any and all liability imposed by law against the Assured for damage to or destruction of property of others . . . sustained or alleged to have been sustained, arising from any cause whatsoever . . . .

Despite the fact that NL was also covered by other primary insurers during the relevant period, NL named only CU as a defendant in this action. Accordingly, CU filed a third-party complaint against those others -- the London Insurers, INA, and

7

Northbrook Insurance Company -- seeking a declaration that any obligation owed NL with respect to the underlying actions was subject to and limited by the obligations of the third-party defendants.

NL moved for partial summary judgment against CU seeking a declaration that New Jersey law would govern the interpretation of its contracts with CU and that CU was obligated to fund NL's defense in the three original lead paint actions. In a July 11, 1991 opinion, the district court purported to address the choice of law issue for both the lead paint and environmental coverage actions. (The environmental coverage dispute, NL Industries, Inc. v. Commercial Union Ins. Co., No. 90-2125, was also pending in the District Court for the District of New Jersey.) The court apparently was under the impression that it had to interpret a given insurance policy uniformly as to both the environmental and the lead paint coverage claims. The court decided that New Jersey law was applicable and, applying it, granted NL's motion for defense costs of the three original lead paint claims.

The case was then referred to a magistrate judge for a hearing on the amount of defense costs. On March 20, 1992, CU and NL entered into a stipulation and settlement agreement with respect to the payment of NL's defense costs incurred prior to March 1, 1992, in the three original lead paint actions. The settlement agreement was intended by the parties to be a final, binding resolution of that issue. Coverage for these three actions, dealt with in the settlement agreement, is therefore not

8

at issue here. After the settlement agreement was finalized, NL moved to amend its complaint to add the four new lead paint lawsuits, which form the basis for this appeal.

These new lead paint actions arose in Pennsylvania and Louisiana after the settlement of the coverage issues for the original three lead paint actions.[0] NL then moved for summary judgment against CU alleging a duty to defend with respect to the four new actions. CU followed with a motion for summary judgment against INA and the London Insurers on its claim for contribution for a portion of the more than $4 million CU paid to NL to reimburse NL's defense costs in the three original actions. CU also sought allocation of defense costs among CU, INA, the London Insurers, and NL.

In opinions and orders dated August 6, 1993 and September 9, 1993, the magistrate judge granted NL summary judgment on the duty to defend the four new claims and denied CU's motion for contribution and allocation.[0] CU filed a motion to vacate the judgment pursuant to Fed. R. Civ.P. 59(e), which the Magistrate recommended be granted, deeming his opinions to be

---

[0] The additional suits were: City of Philadelphia v. Lead Industries Ass'n, No. 90-7064 (E.D. Pa.); Hurt v. Philadelphia Housing Authority, No. 91-4746 (E.D. Pa.); Swartzbauer v. Lead Industries Ass'n, No. 91-CV-3948 (E.D. Pa.); Orleans Parish School Board v. Apex Sales Co., No. 91-6014 (La. Dist. Ct.).

[0] The parties had originally consented to the jurisdiction of the magistrate judge to determine damages and all further proceedings after the district court's 7/11/91 opinion. After the magistrate judge entered final judgment on the four new claims on November 15, 1993, CU contested the magistrate's jurisdiction, leading to its Rule 59(e) motion.

9

reports and recommendations to the district court pursuant to 28 U.S.C. §636(b).

On May 26, 1994, the district court filed an opinion adopting the magistrate judge's findings, granting summary judgment in favor of NL on the issue of CU's duty to defend the four new actions, and denying CU's motion for contribution and/or allocation. The district court adhered to its previous determination that New Jersey law governed the interpretation of the contracts, relying in part on the law of the case doctrine (based on its disposition in the 7/11/91 opinion) and on concerns that applying different states' laws to the various claims would be unmanageable. The court denied CU's motion for contribution from INA and the London Insurers on the basis that it was premature. The court also declined to allocate defense costs between negligence and intentional tort claims on the grounds that there was no "substantial issue" as to coverage, and, consequently, that all claims were potentially covered. This appeal followed.

Since choice of law analysis involves a purely legal question, we exercise plenary review. Armotek Industries, Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 760 n.5, 762 n. 8 (3d Cir. 1991). Moreover, the district court's grant of summary judgment is also subject to plenary review. Public Interest Research of N.J. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991).

II.  New Jersey Choice of Law Principles

A.  General Considerations

10

At the outset, we must carefully distinguish between the environmental coverage disputes, which are not at issue in this appeal, and the (new) lead paint coverage actions, which are. We must also keep conceptually separate the underlying merits actions (certainly not at issue here) from their corresponding coverage litigation. This distinction is not only important for limiting our decision to what is properly at issue in this appeal; it also reflects a crucial distinction in New Jersey's choice of law jurisprudence.

In many areas of the law, New Jersey "has eschewed slavish devotion to rigid principles." See Diamond Shamrock Chems. Co. v. Aetna Casualty & Sur. Co., 609 A.2d 440, 465 (N.J. App. Div. 1992), certif. denied, 634 A.2d 528 (1993); Bell v. Merchants & Businessmen's Mut. Ins. Co., 575 A.2d 878, 880 (N.J. App. Div.), certif. denied, 585 A.2d 395 (1990); State v. Curry, 532 A.2d 721 (N.J. 1987); Veazey v. Doremus, 510 A.2d 1187 (N.J. 1986). Choice of law is no exception. Although the law of the place of contracting has historically governed the choice of law in insurance contract interpretation cases, see, e.g., Buzzone v. Hartford Ac. and Indem. Co., 129 A.2d 561 (1957), in keeping with the general trend the New Jersey courts have moved away from the mechanical application of this rule in favor of a more flexible approach focused on determining which state has the most meaningful connections with and interests in the transaction and the parties. See State Farm Mut. Auto Ins. Co. v. Simmons' Estate, 417 A.2d 488 (N.J. 1980); Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 629 A.2d 885, 888 (N.J. 1993)

(reaffirming and applying Simmons); Colonial Penn Ins. Co. v. Gibson, 552 A.2d 644, 646-47 (N.J. App. Div. 1989) (applying the law of the place of contract unless the Restatement Conflict of Laws (Second) § 6 factors "compel a contrary result").

Nonetheless, the factors that formerly controlled the choice of law analysis remain important considerations in the modern, more flexible approach embraced by the New Jersey courts. Thus, under New Jersey choice of law rules, the law of the place of contracting should ordinarily be applied unless some other state has the "dominant relationship" with the parties and issues.

> [T]he law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 417 A.2d 488, 493 (N.J. 1980). The presumption in favor of the place of contracting serves two objectives: (1) protecting the "reasonable expectations of the parties as to their insured risks," and (2) advancing "certainty, predictability and uniformity." Id. at 496; see also Gilbert Spruance, 629 A.2d at 888 (reaffirming general approach and motivating policies); Gibson, 552 A.2d at 646-47.[0]

---

[0] For these purposes, the place of contracting is the place where the parties executed and delivered the insurance policy. See, e.g., Nelson v. Insurance Co. of North America, 264 F. Supp. 501, 503 (D.N.J. 1967); Empire Mut. Ins. Co. v. Melburg, 336 A.2d 483, 484 (N.J. 1975); Melick v. Stanley, 416 A.2d 415, 417 (N.J. App. Div. 1980). If a company from another state uses an insurance broker to negotiate and purchase its insurance policies, then the

12

Factors and contacts set forth in the Restatement Conflict of Laws (Second) §§ 6 and 188 determine whether or not the place of contracting should in fact govern. See Gilbert Spruance, 629 A.2d at 888; Simmons, 417 A.2d at 491-92. The Restatement lists the following factors and contacts for a court to consider in determining whether the law of a state other than that of contracting has the requisite "dominant relationship."

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement Conflict of Laws (Second) § 6(2) (1988).

For contract actions in particular, § 188 of the Restatement contains the general rule that the law of the state with the most significant relationship to the transaction and the parties should apply. See Gilbert Spruance, 629 A.2d at 888; Simmons, 417 A.2d at 491-92. Section 188 also provides an enumeration of contacts -- such as the domicile, residence, nationality, place of incorporation and place of business of the parties, and the places of contracting and performance -- to

---

place of contracting is the place where the broker negotiated the policies. See Diamond Shamrock Chems. Co., 609 A.2d at 465.

13

guide the identification of the state with the most significant relationship.  Id.

One additional Restatement section is implicated here –
–§ 193 of the Restatement.  That section explains that, in the context of casualty insurance contracts, the application of the contacts articulated in § 188 and the concerns of § 6 should focus on determining which state "the parties understood . . . to be the principal location of the insured risk during the term of the policy unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties. . . ."  Gilbert Spruance, 629 A.2d at 889 (citation omitted, final ellipsis in original).  This focus on the parties' understanding of the principal location of the risk serves to protect both the parties' expectations as to which law would apply and the interests of the state where the risk is principally located in determining the extent of coverage under the insurance contract.  See Restatement of Conflicts (Second) § 193 cmt. c; Gilbert Spruance, 629 A.2d at 889.

B.  Environmental Coverage Cases and the Inappositeness of Gilbert Spruance to Product Liability Cases

Until fairly recently, New Jersey choice of law principles did not treat environmental coverage actions differently from other insurance coverage disputes.  Courts applied the analysis described above in environmental coverage cases as well as other insurance disputes to select a single state's law to

14

apply to all the related claims, irrespective of where the claims arose. As the appellate division explained:

> [W]hen comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insured has bought and insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined . . . . [T]he notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectation of the parties but also the common understanding of the commercial community.

See Westinghouse Electric Corp. v. Liberty Mutual Insurance Co., 559 A.2d 435, 442 (N.J. App. Div. 1989).

In Westinghouse, the plaintiff insured had sought coverage from 144 insurers for thousands of toxic tort claims and numerous site-remediation (environmental) claims arising from eighty-one sites in twenty-three states. Id. at 436. The trial court severed and dismissed all claims for coverage arising outside of New Jersey on forum non conveniens grounds. The Appellate Division reversed, explaining that the plaintiff was "entitled to a single, consistent and final resolution of the choice of law question in a single comprehensive action which will bind it and all its insurers." Id. at 442. Although it specifically declined to reach the choice of law issue, the Westinghouse court reasoned that the combined adjudication of these multitudinous claims would be "manageable if the law of only one state is required to be restated." Id. at 443.

Concerned by the possibility that resolution of coverage issues under one state's laws might deny coverage to

15

claims involving sites in another state whose laws applied to the underlying action -- thus frustrating the vindication of the site state's environmental policies by rendering many of the judgments uncollectible -- the New Jersey Supreme Court developed a specialized analysis for environmental coverage actions. Although Simmons, 417 A.2d 488 (N.J. 1980), remains the definitive case on the proper choice of law analysis for product liability insurance controversies, see Diamond Shamrock Chemicals, 609 A.2d at 465, a different analysis now governs environmental insurance controversies. In Gilbert Spruance, the New Jersey Supreme Court applied the site-specific rule enunciated in Johnson Matthey Inc. v. Pennsylvania Manufacturers Ass'n Insurance Co., 593 A.2d 367 (N.J. App. Div. 1991), for cases involving policies that did not contemplate a New Jersey risk and waste that, while predictably "coming to rest" in New Jersey, was generated out of state. See Gilbert Spruance Co., 629 A.2d at 892.

Gilbert Spruance involved the interpretation of a pollution exclusion clause contained in a comprehensive general liability policy issued by a Pennsylvania carrier to a defendant incorporated in Pennsylvania. The insurance contracts were negotiated and countersigned in Pennsylvania, and the premiums were paid there. Although the waste was generated by the defendant in Philadelphia, the location of the company's paint manufacturing business, the New Jersey Supreme Court was convinced that the parties could "reasonably foresee that a New Jersey waste site would receive the insured's waste products,"

16

thus rendering the application of New Jersey law equitable.  See 629 A.2d at 886.  The state's "compelling interest" in assuring the financing of a clean up of the New Jersey waste site played a very substantial role in the court's conclusion that New Jersey had the "dominant significant relationship" necessary to overcome the substantial contacts with Pennsylvania.  See id. at 894.

Gilbert Spruance thus altered the balance of Restatement § 6 factors in environmental coverage cases.  See 629 A.2d at 894. While it rejected a categorical approach selecting the state of either generation or disposal in favor of a "more extended analysis pursuant to § 6(2)," the Gilbert Spruance court explained that "when applying the principles enunciated in Restatement section 6 to a case in which out-of state generated waste foreseeably comes to rest in New Jersey, New Jersey has the dominant significant relationship."  See 629 A.2d at 894; see also National Starch & Chem. v. Great American Ins. Cos., 743 F. Supp. 318 (D.N.J. 1990) (earlier case finding that the location of the waste sites is of "paramount concern", although not irrebuttable).  Gilbert Spruance thus establishes that, in environmental cases, the location of the site carries very substantial weight in the "significant relationship" analysis, typically adequate to overcome the contacts of the place of contracting.[0]

---

[0]One might argue that Gilbert Spruance establishes the rule that the law of the state where toxic waste comes to rest will apply, if it was reasonably foreseeable that the waste would end up there, obviating the need for the § 6 analysis.  At most, the court left the question open.  See 629 A.2d at 894 ("[W]e express no view on the proposition stated in J. Josephson, Inc, [626 A.3d

17

NL contends that <u>Gilbert Spruance</u> reduces the importance of the place of contracting in all New Jersey choice of law analyses, even outside of environmental claims. Although the appellate division had left open the possibility that the site-specific approach it adopted could apply outside the environmental coverage context it was considering, <u>Johnson Matthey</u>, 593 A.2d at 373, the policies driving the adoption of the site-specific rule are inapposite in product liability coverage actions. In particular, the adoption of the site-specific approach rested heavily on the compelling (for § 6 purposes) interest that a waste-site state has in "determining the availability of funds for the cleanup of hazardous substances located within its boundaries." <u>Leksi Inc. v. Federal Ins. Co.</u>, 736 F.Supp. 1331, 1335 (D.N.J. 1990). But the state's interest in determining coverage for product liability actions is more amorphous and therefore less compelling than its interests in environmental cleanup.

---

81 (N.J. Law Div. 1993),] that when another state is the foreseeable location of the waste-site, the court must engage in a section 6 analysis to determine if that state has the most significant relationship with the parties, the transaction, and the outcome of the controversy . . . ."). In passing on the case before it, however, the <u>Gilbert Spruance</u> court incorporated the interests of the waste site state into the customary § 6 analysis. <u>Id.</u> at 894. The court also endorsed the approach of allowing resolution of issues "by the courts of the states whose interests are immediately affected during the course of litigation <u>which can be effectively managed</u>.". <u>See</u> <u>Gilbert Spruance</u>, 629 A.2d at 895 (emphasis added). We believe that the New Jersey Supreme Court's inclusion of the manageability caveat further signals its intent to preserve a balancing analysis rather than to discard it in favor of an inflexible rule.

18

There is also less predictability concerning the situs of product liability claims, and a manageability problem in light of the potentially far larger number of product liability claims (relative to environmental sites in any given insurance coverage action.) Thus, because the benefits of the site-specific approach are reduced while the problems associated with its implementation are magnified outside the environmental coverage context, we believe that the New Jersey Supreme Court would not extend the site-specific approach to the product liability coverage area.[0]

There is precedent for our differential treatment of the choice of law question in the product liability coverage situation relative to the environmental coverage situation. In Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co., 609 A.2d at 465, which preceded but foreshadowed Gilbert Spruance, the Appellate Division addressed a case involving both Agent Orange product liability claims and environmental claims stemming from the defendant's manufacture of dioxin. For the Agent Orange toxic tort claims, the court relied on the fact that

---

[0]In applying the new standard to environmental choice of law questions, the New Jersey courts will have to conduct separate choice of law analyses for environmental coverage claims and for mass tort coverage claims even when they arise in a single case. There is nothing anomalous about this result, since § 145 of the Restatement Conflicts of Laws explains that, even within a single action, the choice of law analysis applies to particular issues, not to the case monolithically. Moreover, in repudiating the uniform contract approach, see Gilbert Spruance, 629 A.2d at 892, the New Jersey Supreme Court has demonstrated a willingness to countenance the application of different state laws even to a single issue of coverage. This may of course be quite difficult and time-consuming, and result in serious management problems for the courts applying this rule.

the New York was the place of contracting to apply New York law to all of the Agent Orange coverage actions irrespective of where the claims arose.

Diamond Shamrock, incorporated and located in Ohio, had used a New York broker to purchase the policies. The court found that the facts that Agent Orange was manufactured in Newark, New Jersey, that it was sold to the government in New Jersey, that some of the claimants were New Jersey veterans, that some of the underlying suits were filed in New Jersey, and that the coverage action was pending in New Jersey did not establish the dominant relationship necessary to override the preference for New York as the place of contracting.

However, in determining which law to apply in the dioxin environmental coverage actions, the Diamond Shamrock court correctly anticipated the New Jersey Supreme Court by using the site-specific analysis enunciated by the Appellate Division's opinion in Gilbert Spruance. The court determined that the law of New Jersey, the state where toxic wastes predictably came to rest (dioxin was manufactured in Newark), should apply to the environmental coverage claims involving New Jersey sites. See 609 A.2d at 455. While this case predated Gilbert Spruance, it presaged the principles announced in that decision, and therefore effectively demonstrates how a court confronting environmental coverage claims and other coverage claims in the same suit must perform distinct choice of law analyses for each.

In summary, fundamental choice of law principles require that courts consider different issues separately; a

20

single analysis does not typically resolve the choice of law question for all claims in a suit. After <u>Gilbert Spruance</u>, New Jersey's choice of law rules require not only that environmental coverage claims be considered separately from other claims (such as for product liability), but also that they be considered in the site-specific framework, which is distinct from the customary, modified contacts analysis still applicable in other coverage contexts.

C. The District Court's Approach

After re-examining the choice of law issue, the district court essentially adopted its July 11, 1991 choice of law decision in disposing of these four new lead paint coverage claims. The 1991 decision purported to analyze the question for both the environmental coverage action and the lead paint coverage action, (as the combined caption and conflated discussion of the two actions suggest). The district court apparently believed that a single choice had to be made for both. Although it acknowledged that the lead paint cases were the subject of an action separate from the environmental coverage action, it stated:

> [P]laintiff seeks a declaratory judgment of defendant's liability for those three particular [lead paint] claims in the "environmental action" as well. Thus, the court must apply the same substantive law in both the "lead paint" and "environmental" actions, or else the parties rights and obligations under the policy as it applies to the "lead paint" claims would be interpreted according to two states' substantive laws.

7/11/91 Op. at 8 n.3.

21

The court also relied on the uniform contract approach articulated in <u>Westinghouse Electric Corp. v. Liberty Mutual Insurance Co.</u>, 559 A.2d 435 (N.J. App. Div. 1989), to support its choice of New Jersey law for all the environmental and product liability claims notwithstanding the fact that only some of the waste sites and none of the lead paint actions were located in New Jersey. (7/11/91 Op. at 10).  In reaffirming its 1991 choice of law decision, the district court applied the law of the case doctrine and rejected CU's argument that an intervening change in the law wrought by <u>Gilbert Spruance</u> required a different resolution.  The court also cited its concerns about the manage-ability of the site-specific choice of law approach in refusing to apply <u>Gilbert Spruance</u>.[0]

In its initial (1991) decision, the district court acknowledged the presumption in contract actions in favor of the law of the place of contracting (here, New York). (7/11/91 Op. at 5).  Nevertheless, the court relied on the "strong public interest in insuring that environmental contamination within the state will be remedied," <u>id</u>. at 8, to find the "significant relationship" necessary to select New Jersey law instead. Indeed, the court conceded that the other considerations in the contractual "significant relationship" inquiry, such as the

---

[0]Although the district court was aware of the site-specific test announced by <u>Gilbert Spruance</u> after its original choice of law decision in 1991, it declined to apply the test because its application in the environmental case would result in the choice of 34 different state laws, a result it regarded as so unmanageable that the New Jersey Supreme Court could not have intended it.

reasonable expectations of the parties and the need for certainty and legal uniformity, actually favored the choice of New York law as the place of contract and would have resulted in that choice were it not for the significant relationship supposedly established by the presence of some New Jersey waste sites.  See 7/11/91 Op. at 10.

In sum, the choice of law analysis for the lead paint claim coverage dispute is separate and distinct under New Jersey law from that for the environmental claims, and yet the district court appears to have combined the claims for this purpose in both the original 1991 opinion and its May 26, 1994 opinion.  See 7/11/91 Op. at 7-8 and 5/26/94 Op. at 10.[0]  This was error.

---

[0] While the court seemed to accept the magistrate's conclusion that the law of the case doctrine obviated any need for the court to reconsider the original choice of law decision for the four new lead paint actions, see 4/26/94 Op. at 6, it conceded that Gilbert Spruance's rejection of the uniform contract approach "might require the court to re-examine its choice of law decision." Id. at 9.  The court did re-examine its 1991 decision, see Id. at 9, but abided by it both because of manageability concerns and because of the court's conviction that New Jersey, where a number of the environmental claims arose, had the "dominant significant relationship" to the transaction.  Notwithstanding the fact that Gilbert Spruance pertained solely to environmental coverage actions, we agree that it precluded application of the law of the case doctrine here.  Although federal courts always retain the discretion to reconsider issues already decided in the same proceeding, see Deisler v. McCormack Aggregates Co., 54 F.3d 1074, 1086 n.20 (3d Cir. 1995); Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction*, §4478 at 789-90, courts will reconsider an issue when there has been an intervening change in the controlling law, when new evidence has become available, or when there is a need to correct a clear error or prevent manifest injustice.  Wright, Miller & Kane, § 4478 at 790.  We believe reconsideration was warranted here for two reasons.  First, the district court's failure to perform a separate choice of law analysis for the environmental coverage action and for the lead paint coverage action constituted a clear error. Second, to the extent that the

## III. Discussion

CU argues that the district court compounded this error by considering the (social) policies implicated by the underlying actions, rather than limiting its focus to the policies of insurance law. We must address this contention before proceeding to the appropriate choice of law framework applicable to the lead paint coverage actions.

In coverage cases, New Jersey courts have elected to analyze not only the policies involved in interpreting insurance law but also those policies underlying their environmental and tort laws. See Diamond Shamrock Chemicals, 609 A.2d at 455 ("Since New Jersey has a paramount interest in the remediation of such waste sites, and in the fair compensation of its victims, this State's urgent concern for the health and safety of its citizens 'extends to assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds.'") (citing Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 593 A.2d 367, 370 (App. Div. 1991)). Therefore, a court would not err by considering the interests implicated by the underlying litigation in deciding the choice of law issue in an insurance coverage action (to the extent that the underlying litigation affects the interests of one of the states whose law arguably applies). These underlying policy interests are

_____

court conflated the environmental coverage action with this lead paint coverage action, the change announced by Gilbert Spruance -- creating a unique analysis for environmental coverage cases -- constituted an intervening change in the controlling law.

24

especially important in environmental coverage cases. See supra at 18.

But the analysis of the various states' policies and interests implicated in the environmental coverage litigation does not track the analysis of the interests implicated by the tort cases underlying this coverage dispute. Cf. Diamond Shamrock, 609 A.2d at 455, 465 (applying New Jersey law to dioxin environmental suits and New York law to Agent Orange claims). Unlike some of the underlying environmental claims which must be decided under New Jersey law, Pennsylvania or Louisiana law governed the four new (underlying) lead paint actions. See Appellant's Br. at 17. Thus, although New Jersey may have an interest in applying its laws to coverage disputes involving actions whose underlying merits were adjudicated under New Jersey law (in order to assure that the state's tort policies are not frustrated by a lack of insurance coverage), that interest is simply inapposite to these new lead paint actions arising in Pennsylvania and Louisiana. There is no indication, moreover, that the district court applied New Jersey law to the coverage dispute in an effort to protect New Jersey's tort (as opposed to environmental) policies.

While CU's contention that the court should not have considered the policies implicated in the underlying litigation has no merit, the district court did, as we have stated, err by considering policies implicated in the related but separate environmental actions rather than those involved in the lead paint actions. See 5/26/94 Op. at 10 (reaffirming July 1991

25

decision and explaining, "[t]hat decision was based in part on the number of environmental claims in the companion action arising in New Jersey, and admittedly on the need for uniformity in the interpretation of the insurance contracts at issue in both suits."). Even before Westinghouse was overruled by Gilbert Spruance, the uniform contract approach should have been applied separately to aggregate the environmental claims, which turned on the interpretation of one clause in the insurance contract, and to the product liability claims, which involved a different clause of the policy and deserved, under the principles of Restatement § 145, a separate choice of law analysis.

The court found that New Jersey had "the dominant relationship to the parties and the underlying insurance transaction" even though New Jersey's only connection to the case is its incorporation of the defendant. To so find in spite of the facts that the harms occurred in Pennsylvania and Louisiana and that the insurance contracts were negotiated and executed in New York -- so that the parties must have reasonably expected, as even the district court recognized, New York law to apply -- manifests the court's conflation of the relevant interests in this case with those relevant in the environmental action. As we have discussed, even if the environmental coverage claims and the lead paint coverage claims were brought in a single action, § 145 required the court to conduct a separate choice of law analysis for each of the two types of claims.

The choice of law for this non-environmental insurance coverage action is still governed by State Farm Mut. Auto Ins.

26

Co. v. Estate of Simmons, 417 A.2d 488 (N.J. 1980), and thus, unless a "dominant and significant relationship" mandates the application of another state's law, the law of the place of contract will apply. Given that the contract was negotiated, executed and performed in New York, the district court correctly concluded that New York was the place of contracting. We now examine the contacts and interests relevant under Restatement §§ 6 and 188 to determine whether New Jersey had a "dominant and significant relationship" to the lead paint coverage action. See Gilbert Spruance, 629 A.2d at 888; Simmons, 417 A.2d at 491-92.[0]

Section 188 lists as the contacts to be considered in applying the interests analysis: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement Conflicts (Second) § 188(2). These contacts overwhelmingly favor New York in this case. As we stated earlier, NL retained a New York insurance broker to negotiate the policies; the policies were signed in New York by representatives from each parties' New York office; CU coded the NL policies and premiums as New York policies and premium taxes on these policies were paid in New York; NL's headquarters as well as its principal business operations were located in New York; and CU executed this

---

[0]None of the parties argued that either Pennsylvania's or Louisiana's law should apply to this action.

27

transaction out of its New York office. Only NL's place of incorporation favored New Jersey law.

Even though the subject-matter-of-the-contract factor (liability for property damage and bodily injury) does not necessarily favor New York law, it certainly does not favor New Jersey law. Because these contacts so clearly favor the application of New York law, it should apply unless the interests described by § 6 of the Restatement, see supra at 11-12, establish a dominant and significant relationship with New Jersey. We take these factors up seriatim.

1. The Needs of the Interstate System

The Restatement explains that this factor is intended to "further harmonious relations between states and to facilitate commercial intercourse." Restatement Conflicts § 6 cmt. d. The consistency and predictability which emanate from a clear rule foster commerce and harmonious interstate relations by reducing the uncertainty associated with entering into commercial transactions. Relative to the multifactored interest analysis, the lex loci contractus rule typically better protects both the parties' reasonable expectations and the consistency and predictability of contractual adjudications. See Simmons, 417 A.2d at 496. As the § 188 analysis demonstrates, this factor clearly favors New York law. Moreover, the district court acknowledged that the parties must have reasonably expected New York law to apply. Thus, both generally and under the specific facts of this case, the needs of the interstate system would be best served by the choice of New York law.

28

2. Relevant Policies of Other Interested States

State statutes which require or prohibit particular clauses in insurance agreements evidence a state's policy in the insurance area. See Belle v. Merchants & Businessmen's Mutual Ins. Co., 575 A.2d 878, 881-82 (App. Div.), cert. denied, 585 A.2d 395 (N.J. 1990). But states' interests in insurance policy interpretation are not limited to those explicitly articulated in these sorts of statutes. As we have explained, New Jersey courts seek to avoid the frustration of the interests and policies expressed in their substantive laws that could occur through narrow interpretations of the coverage available under the applicable insurance contracts. See Diamond Shamrock Chem. v. Aetna, 609 A.2d 440 (N.J. App. Div. 1992) ("Since New Jersey has a paramount interest in the remediation of such waste sites, and in the fair compensation of its victims, this State's urgent concern for the health and safety of its citizens 'extends to assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds.'") (citing Johnson Matthey Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 593 A.2d 367, 370 (N.J. App. Div. 1991)). Thus, a state's interest in determining the scope of liability in the underlying lead paint claims does bear on the scope of coverage.

The lead paint claims whose coverage is at issue here will be decided under Pennsylvania and Louisiana law. New York pursues a policy of deterring the sort of conspiratorial activity alleged to have occurred in New York by assuring that the penalties imposed through tort awards actually impact on the

29

alleged perpetrators rather than on their insurance carriers. See Technicon Electronics Corp. v. American Home Assur. Co., 533 N.Y.S.2d 91, 102 (App. Div. 1988), aff'd, 544 N.Y.S.2d 531 (1989) (noting New York's policy of "assur[ing] that corporate polluters bear the full burden of their own actions spoiling the environment" by giving pollution exclusion clauses broad effect). See also National Starch & Chem. v. Great Am. Ins. Co., 743 F.Supp. 318, 319 n. 1 (D.N.J. 1990) (observing that relative to New Jersey law, New York law was less favorable to insureds in disputes involving the pollution exclusion clauses of insurance contracts). Although the parties did not brief the nature of Louisiana's or Pennsylvania's tort policies, i.e., whether they favor compensation and deterrence over fostering a hospitable business environment, it is clear that New Jersey has no interest in interpreting the insurance contracts that could vindicate those other states' policies. In any event, it seems unlikely that Pennsylvania's or Louisiana's interest standing alone could overcome the very substantial contacts and interests of New York.

3. Relevant Policies of the Forum

For a state's policies to be relevant in a choice of law analysis, the law embodying the policy must relate to a contact. See Veazey v. Doremus, 510 A.2d 1187, 1189-90 (N.J. 1986) ("If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply."). The district court relied on the number of environmental claims arising in New Jersey for its conclusion that New Jersey had the dominant and significant

30

relationship necessary for the application of New Jersey law in this case. 5/26/94 Op. at 10. Two errors render this analysis flawed. First, this lead paint coverage case did not properly implicate any of New Jersey's environmental policies. Second, even if New Jersey's environmental policies were at all pertinent in these lead paint cases, they bear no relation to New Jersey's contacts. New Jersey's only connection to this litigation is that NL was incorporated and had some operations there.

While these contacts might justify consideration of New Jersey's policies in corporate governance or tax cases, they do not justify considering New Jersey's tort policies or the related insurance coverage policies. The district court did recognize New Jersey's interest to "see[] that harms caused by its corporations are properly redressed." See 5/26/94 Op. at 11. Cf. Restatement Conflicts of Laws (Second) § 145 cmt. c ("If the primary purpose of the tort rule involved is to deter or punish misconduct, . . . the state where the conduct took place may be the state of dominant interest . . . ."). However, given that the activities complained of here (the alleged conspiracy of NL and the Lead Industries Association to conceal the dangers of lead paint) primarily occurred in New York, New Jersey's disciplinary interests are attenuated. Moreover, expressions of New Jersey's policies seem to reflect a greater emphasis on compensation, which would favor the law of the state where the injury occurred, than on deterrence, which would favor the law of the state where the conduct occurred. See Diamond Shamrock, 609 A.2d at 455 (emphasizing New Jersey's "paramount interest" in

31

remediation and compensation); Leksi, 736 F.Supp. at 1334-36; National Starch, 743 F.Supp. at 326. Thus, we find that New Jersey's interests were either inapposite or quite small compared to New York's.

    4. Protection of Justified Expectations

    Like the first factor, this factor seeks to promote commercial transactions. By enforcing the parties' expectations, courts interpreting contracts assure the consistency and predict-ability necessary to a healthy business environment. Indeed, for these very reasons, traditional contract principles direct that the parties' objectively reasonable expectations govern the choice of law decision. See National Starch and Chem. Co. v. Great Am. Ins. Cos., 743 F. Supp. 318, 324 (D.N.J. 1990) ("[T]he reasonable expectations of the parties are controlling[, and] State Farm [v. Simmons] must be applied with a view toward fulfillment of the parties' objectively reasonable expectations.").[0] We agree with the district court that the parties' objectively reasonable expectations were that New York law would govern the interpretation of these contracts. See 7/11/91 Op. at 10 ("Because all parties to the contract knew at the time of the signing the general rule that the law of the

_____

[0]Although the National Starch court, failing to anticipate Gilbert Spruance, applied the uniform contract approach to choose the law of the place of contract over the laws of the states where sites were located, its statement of the principle quoted in the main text remains valid. The National Starch court cited general contract cases from New Jersey to support the proposition that reasonable expectations should govern contract issues, including the choice of applicable law. See Meier v. New Jersey Life Ins. Co., 503 A.2d 862, 869-70 (N.J. 1986) (using reasonable expectations to determine scope and terms of policy surrender).

state in which the contract was formed governed the contract, it is reasonable to assume that the parties reasonably expected New York law to apply.")

Nevertheless, the district court did not accord this consideration much weight in its analysis, principally because it was under the erroneous impression that New Jersey's strong interest in remediating environmental contamination within the state gave New Jersey, where many of the waste sites were located, a dominant interest in applying its laws to any and all coverage disputes.[0]  As we have explained, however, <u>Gilbert Spruance</u> only increased the importance of the interest of the waste-site state in environmental coverage disputes, not in product liability suits. Consequently, the objectively reasonable expectations of the parties should have been accorded the considerable weight that they ordinarily receive, which favors New York law in this case.

>    5.    The Basic Policies Underlying the Relevant
>          Fields of Law (Insurance and Tort Law)

The differing degrees of interest which competing states have in vindicating various insurance and tort law policies also affect the choice of law.  Insurance law policy deals primarily with the proper standards and procedures for the

---

[0]The 7/11/91 district court opinion predated <u>Gilbert Spruance</u> and thus did not rely on it.  The district court's May 26, 1994 opinion disposing of the four new lead paint claims, <u>see</u> <u>supra</u> p. 8, does cite <u>Gilbert Spruance</u> in order to affirm its emphasis on the location of the waste sites in the companion environmental action, which was the basis for its decision to apply New Jersey law to the lead paint claims.  As we have explained, this was incorrect.

fair interpretation of the insurance contract, accounting for the interests of the insurer, the insured, and the public. Given the overwhelming contacts of the insurance transaction to New York, we are hard pressed to find an interest New Jersey (or any other state) can assert in using its law to determine the balance of relevant insurance policies.

Tort law policies, on the other hand, influence the standards and procedures used to determine liability, fix compensation, and deter tortious conduct. The sole interest New Jersey could have in applying its tort law under the facts of the lead paint cases (where the injury occurred elsewhere) would be to discipline a company incorporated under its laws. As we have noted, however, New Jersey seems to be more concerned with assuring adequate funds for compensation and remediation than it does with imposing penalties. See supra at 31-32. Because NL's principal place of business and, perhaps more importantly, the locus of the alleged tortious conduct were not in New Jersey, see supra at 4-5, New Jersey's interest in disciplining the company is weak. It is New York, as the locus of the alleged conspiratorial acts and as NL's principal place of business, which has the interest in fashioning the penalty imposed by the tort system.

To the extent that the harms occurred and the injured parties resided in Pennsylvania and Louisiana, those states may have an interest in assuring that the tortfeasor redresses the property damage and personal injury. The relative strength of such an interest depends on the balance of policies -- such as

34

compensating victims or deterring culpable conduct, see Restatement Conflicts (Second) § 145 cmt. c -- struck by the relevant tort laws. In any case, both Pennsylvania and Louisiana have some interest in seeing that the harms occurring within their borders are redressed. But New Jersey does not have a cognizable interest in applying its tort laws to these lead paint coverage disputes.

6. Certainty, Predictability, and Uniformity of Result

This factor closely tracks the concerns embodied in the first (needs of the interstate system) and fourth (justified expectations of the parties) factors in its concern about the effects of more flexible, and thus less predictable, legal rules on commercial activity. As we have explained, New York as the place of contracting and as the locus of the allegedly unlawful activity would presumably apply its law to this case. The district court correctly recognized that these parties must have reasonably expected New York law to apply, and it is likely that repeat players in this market, whose business the resolution of this case will affect, would also expect New York law to apply under these circumstances. While some might have entertained the possibility that the insurance coverage action might be governed by the law of the states where the harms ultimately occurred (here, Pennsylvania and Louisiana), it is unlikely that anyone expected that the law of a state whose connections and interests are as tangential as New Jersey's are in this case would apply. Indeed, to establish a standard where such comparatively minor interests could govern would throw settled expectations into

35

disarray; parties would have no way of predicting which law would apply to their contracts. We therefore conclude that this factor strongly favors the choice of New York law.

7. Ease of Determination and Application

The Restatement explains that choice-of-law rules "should be simple and easy to apply." See Restatement Conflicts (Second) § 6, cmt. j. Presuming that the law of the place of contracting applies to non-environmental insurance coverage disputes provides a simple and clear cut rule for courts to apply ex post. Such a rule also provides a stable and predictable environment for contracting parties ex ante. This factor, therefore, also favors New York law, although the Restatement does not weigh this consideration too heavily. Id.

8. Summary

After performing this separate choice-of-law analysis for the lead paint coverage disputes, we conclude that the interests implicated in this lead paint coverage action do not relate to the contacts NL had with New Jersey. At best, New Jersey had an "interest in seeing that harms caused by its corporations are properly redressed." 5/26/94 Op. at 11. But given that NL's principal place of business was in New York and that New Jersey's laws do not apply to the underlying products liability actions, this interest is especially attenuated here. In contrast, the connections of NL and of the insurance transaction to New York are both significant and pertinent, giving rise to the substantial interest New York has in seeing

36

its law apply:  the insurance contract was negotiated and performed in New York; the policies were coded as New York policies; New York taxes were paid on the policies; both parties maintained their principal places of business there; and the conspiratorial acts underlying these lead paint claims are alleged to have occurred there.  Under Simmons, therefore, New York law should apply.

IV. Conclusion

We will therefore reverse the judgment of the district court and remand for further proceedings in which the court should apply New York law to the four new lead paint actions. Because the issues of CU's duty to defend and its rights to contribution and allocation were improperly decided under New Jersey law, the district court should make the New York law determination in the first instance on remand.  We do not reach the other claims.[0]

_____

[0] Although CU's duty to indemnify NL for these lead paint claims was separately adjudicated in the environmental action, which is not before us, we believe that the foregoing analysis of Gilbert Spruance may be pertinent to the indemnity issue as well.