NL INDUSTRIES, INC., Plaintiff,

v.

COMMERCIAL UNION INSURANCE COMPANY, Defendants.

COMMERCIAL UNION INSURANCE COMPANY, Third–Party Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, Insurance Company of North America, and Northbrook Excess and Surplus Insurance Company, Third–Party Defendants.

NL INDUSTRIES, INC., Plaintiff,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, Insurance Company of North America, and Northbrook Excess and Surplus Insurance Company, Third–Party Defendants.

Civ. No. 90–2124 (WHW).

United States District Court,
D. New Jersey.

April 30, 1996.

Peter B. Bensinger, Jr., Bartlit Beck Herman Palenchar & Scott, Chicago, Illinois and Kirkland & Ellis, Chicago, Illinois and Kevin J. Connell, McCarter & English, Newark, New Jersey, for Plaintiff NL Industries.

Richard S. Feldman, David M. Cassidy, Howard M. Tollin, Michael J. Balch, Rivkin, Radler & Kremer, Uniondale, New York, and Joni F. Mason, Rivkin, Radler & Kremer, Newark, New Jersey, and Einhorn, Harris, Ascher & Barbarito, Denville, New Jersey, for Defendant and Third–Party Plaintiff Commercial Union.

Terry Cosgrove, Peterson & Ross, Chicago, Illinois and William B. McGuire, Tompkin, McGuire & Wachenfeld, Newark, New Jersey, for Third–Party Defendant Certain Underwriter's at Lloyd's, London and British Companies.

Paul Koepff, Joseph Boury, O'Melveny & Myers, New York City, and Ribis, Graham & Curtin, Morristown, New Jersey, for Third–Party Defendant Insurance Company of North America.

## OPINION

WALLS, District Judge.

This matter comes before the Court on plaintiff NL Industries, Inc. ("NL") motion for summary judgment against defendant Commercial Union Insurance Company ("CU"); on CU's cross-motions for summary judgment against NL, and third-party defendants Certain Underwriters at Lloyd's ("Lloyd's"), and Insurance Company of North America ("INA"); and on Lloyd's cross motion for summary judgment against CU.

### FACTS

This dispute is one skirmish in the battle over insurance coverage for environmental and lead paint claims that have been asserted against NL. These motions, concerning the defense costs relating to both the "old" and "new" lead paint claims, are perhaps emblematic of the protracted nature of the controversy as a whole; though they had originally been brought and seemingly resolved more than three years ago, they have now, phoenix-like, arisen again. Below are the facts which have led to this refrain.

*The Underlying Suits*

At issue are seven actions seeking relief for harms associated with lead paint in which NL has been named a defendant. In NL's initial complaint against CU it sought a declaration that CU was obligated to defend against and provide coverage for claims brought against NL in the following three suits ("the original suits"): *Santiago v. Sherwin–Williams Co. et al.*, No. 87–2799–T (filed in D.Ma.); *Housing Authority of New Orleans v. Standard Paint and Varnish Co., et al.*, No. 90–6901 (filed in Civ.Dist.Ct, La.); *City of New York, et al. v. Lead Industries Association, et al.*, No. 14365/89 (filed in Sup.Ct., N.Y.). CU in turn filed a third-party complaint against INA and Lloyd's for contribution and indemnity.

NL later amended its complaint to include the following four lead paint actions asserted against it ("the new suits"): *Orleans Parish School Bd. v. Apex Sales, Co.*, No. 91–6104 (filed in La.Pelt. on July 2, 1991); *Swartzbauer v. Lead Indus. Assoc, Inc.*, No. 91–3948 (filed in E.D.Pa. on June 21, 1991); *Hurt v. Philadelphia Housing Auth.*, No. 91–4746 (filed in E.D.Pa. on July 25, 1991) and *City of Philadelphia and Philadelphia Housing Authority v. Lead Indus. Assoc., Inc.*, No. 90–7064–JG (filed in E.D.Pa. on November 5, 1991). CU amended its third-party complaint against INA and Lloyd's for contribution and indemnity relating to these suits, as well.

*The Original Suits*

*Santiago v. Sherwin–Williams Co. et al.*, ("*Santiago* "), is a products liability action in which the complaint alleges that NL and others produced and marketed lead paint for use in dwellings accessible to young children, and that plaintiff's one year old daughter, ingested lead paint and was diagnosed as having lead paint poisoning in November 1973.

*Housing Authority of New Orleans v. Standard Paint and Varnish Co., et al.*, ("*HANO* "), is brought against NL and others to recover expenses incurred by the Housing Authority of New Orleans in complying with a consent judgment requiring the Housing Authority to adhere to federal regulations regarding lead abatement; the need for lead abatement allegedly arose from lead paint applied to various areas within the Housing Authority's buildings.

The complaint in *City of New York, et al. v. Lead Industries Association, et al.*, ("*City of New York* "), demands recovery for the cost of inspecting, testing, monitoring, and abating lead paint in both municipally and privately owned residential buildings. It also seeks recovery of the costs of any judgments or settlements in seventy-eight personal injury actions claiming lead poisoning made against the City is a defendant. The causes of action sound in negligent design, failure to warn, strict products liability, fraud and misrepresentation. On December 23, 1991, all of these claims, except those based on fraud, were dismissed on statute of limitations grounds.

*The New Suits*

On July 22, 1991, NL was named defendant in *Orleans Parish School Bd. v. Apex Sales, Co.*, No. 91–6104 ("*Orleans Parish*"). This claim of the Orleans Parish School Board against NL and other producers and manufacturers of lead pigment and lead paint seeks to recover costs for an abatement program to remove lead from plaintiff's buildings. Plaintiff alleges that large amounts of lead paint were applied to the interior and exterior surfaces of plaintiff's building during the 1940s, 1950s, and 1960s. Plaintiff also alleges that the presence of lead-based paint in plaintiff's school buildings "represent a potential hazard to the children who are students in these schools."

*Swartzbauer v. Lead Indus. Assoc, Inc.*, No. 91–3948, ("*Swartzbauer* "), is a lead paint class action served upon NL on June 21, 1991. The plaintiffs—purportedly over 21,-000 New Jersey and Pennsylvania painters and their spouses—allege bodily injury and/or fear of bodily injury as a result of exposure to the lead products produced and marketed by NL and other defendants. They claim that their injuries resulted from a course of conduct by NL and other defendants dating from 1928 to at least 1978. They further allege "chronic long term exposure" to the defendants' lead-containing products.

On July 25, 1991, NL was named as a defendant in *Hurt v. Philadelphia Housing Auth.*, No. 91–4746 ("*Hurt*"), a class action in the United States District Court for the Eastern District of Pennsylvania. Plaintiffs are residents of public housing maintained by the Philadelphia Housing Authority. They seek damages for bodily injury and/or the threat of injury from exposure to lead pigment manufactured by NL and others. Further, plaintiffs seek to recover the cost of abating alleged hazards caused by the presence of lead in buildings built or repainted before 1978, including the cost of removal of the lead. Plaintiffs allege injuries resulting from a course of conduct by defendants, including NL, dating from the 1920's to at least 1978.

On November 5, 1990, NL was named defendant in a class action in the United States District Court for the Eastern District of Pennsylvania captioned *City of Philadelphia and Philadelphia Housing Authority v. Lead Indus. Assoc., Inc.*, No. 90–7064–JG, ("*City of Philadelphia*"). This claim is brought on behalf of a putative class of all cities in the United States with a population over 100,000, whose housing or public health authorities are engaged in or contemplating a lead abatement program. Plaintiffs seek to recover liability costs in bodily injury actions based on alleged lead poisoning of residents and the costs of abating lead paint hazards. The plaintiffs declared that from the early 1900's to 1977, NL processed, manufactured, designed, developed, tested, packaged, inspected, sold, distributed, supplied, delivered and/or marketed lead pigments for use in lead paint that was used on interiors and surfaces in properties within plaintiffs' jurisdictions.

*The Policies*

CU, INA and Lloyd's issued primary insurance policies to NL which were allegedly effective during time periods relevant to the underlying claims.

Under a series of policies from February 1, 1966 to January 1, 1978, CU provided NL with primary comprehensive general liability insurance coverage (the "CU policies"). In those policies, CU promised to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of"—"Coverage A bodily injury" and "Coverage B property damage." These policies all contain this standard clause:

> [T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent.

INA issued primary liability coverage to NL under policies that were in effect from January 1, 1978 to March 1, 1989. These agreements provide:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
>
> A.   bodily injury
>
> B.   property damage
>
> to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage ...

The INA policies define "occurrence" as an "event including injurious exposure to conditions, which results during the policy period in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." "Property damage" is "(1) physical injury to or destruction of tangible property which occurs during the policy period...."; "bodily injury" means "bodily injury, sickness or disease sustained by any persons which occurs during the policy period, including death, at any time resulting therefrom."

Lloyd's issued liability policies to NL which provide coverage for property damage from January 1, 1946 to May 1, 1970. The coverage section of the Lloyd's policies provides:

> *COVERAGE:* From and against all loss, costs, damages, attorney fees and expenses of whatever kind and nature which the Assured may sustain or incur by reason of or in consequence of:

(a) Any and all liability imposed by law against the Assured for damage to or destruction of property of others ... sustained or alleged to have been sustained, arising from any cause whatsoever ...

### Procedural History

On July 11, 1991, District Judge Sarokin granted NL summary judgment on CU's duty to defend NL in connection with the original lead paint cases. Following this ruling, NL and CU entered into a stipulation and settlement agreement dated March 20, 1992 ("Settlement Agreement") concerning CU's reimbursement obligations as to defense costs NL incurred prior to March 1, 1992. Under the Settlement Agreement, CU did not appeal Judge Sarokin's ruling, and CU does not contest that ruling in this motion. By its express terms, the Settlement Agreement has "no effect upon the subrogation or contribution rights, if any," of NL or CU.

NL, on September 14, 1992, moved for summary judgment on its claim that CU had a duty to defend the four new lead paint cases. CU filed a cross-motion for summary judgment seeking a declaration that it had no such duty. In addition, on November 2, 1992, CU moved for summary judgment against INA, Lloyd's and NL for contribution of past defense costs and allocation of future defense costs relating to the three original lead paint cases, and for contribution from NL for the new lead paint cases.

Originally, the parties had agreed that Magistrate Judge Joel Pisano could decide the motion, sitting in the stead of the District Court pursuant to 28 U.S.C. § 636(c). Judge Pisano heard argument and thereafter granted NL's motion, and denied CU's motions, on September 23, 1993. *NL Indus. v. Commercial Union Ins. Co.,* 828 F.Supp. 1154 (D.N.J. 1993), *rev'd and remanded, NL Indus. v.*

*Commercial Union Ins. Co.,* 65 F.3d 314 (3d Cir.1995). CU then cited an alleged deficiency in the parties' consent to Judge Piano's jurisdiction and objected to Judge Pisano deciding these substantive motions. Judge Pisano therefore restyled his opinion and order as a Report and Recommendation to Judge Sarokin.

On May 26, 1994, Judge Sarokin granted NL's motion and denied CU's motions. CU appealed from Judge Sarokin's order, arguing in part that Judge Sarokin erroneously applied New Jersey law in interpreting the CU policies. On September 8, 1995, the Third Circuit reversed and remanded with the following instructions: "Because the issues of CU's duty to defend and its right to contribution and allocation were improperly decided under New Jersey law, the district court should make the New York law determination in the first instance on remand."

Accordingly, NL has renewed its motion for summary judgment against CU with regard to defense costs for the four new suits. CU has likewise cross-moved against NL, and the third-party defendants Lloyd's and INA, for contribution relating to the three original suits. Specifically, CU seeks full contribution to defense costs from INA and Lloyd's, but, because of the Settlement Agreement, seeks contribution for these costs from NL only since March 1, 1992. Lloyd's has also cross-moved for summary judgment against CU.[1]

## *DISCUSSION*

### *SUMMARY JUDGMENT STANDARD*

■ Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The

---

**1.** Andrew Weir Associates, one of the London Insurer's who fall under the rubric of third-party defendant Lloyd's, is the subject of an insolvency proceeding in the United Kingdom and is a debtor in a case, Case No. 92B–46894 (PBA), filed pursuant to 11 U.S.C. § 304 in the United States Bankruptcy Court for the Southern District of New York. Pursuant to that Bankruptcy Court's Permanent Injunction Order dated March 30, 1994, all persons are enjoined from taking any

action against Andrew Weir or its property, subject to certain limitations not relevant here. Consequently, this Court will not address any claims involving him, Bermuda Fire and Marine Insurance Company Ltd., English & American Insurance Company (formerly Slater Walker Life Assurance Company), or Orion Insurance Company PLC. All determinations this Court reaches concerning third-party defendant Lloyd's shall be understood not to include these insurers.

movant must show that if the evidence submitted were reduced to evidence admissible in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3rd Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

■ At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, rather, it is to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In doing so, the Court must construe the facts and inferences in a light most favorable to the non-moving party.

## I. NL'S MOTION FOR SUMMARY JUDGEMENT AGAINST CU

NL asserts that it is entitled to summary judgment on its claims for reimbursement, under the CU policies, of the costs it has and will continue to accrue defending the four new lead paint cases. CU proffers the following arguments to defeat summary judgment: 1) the claims in the underlying cases assert that NL has committed intentional torts, which are not covered by the policy; 2) no "occurrence" within the meaning of the policy has occurred; 3) lead poisoning was a "known loss" or "loss in progress"; 4) NL breached the notice provision of the policies; 5) NL breached the cooperation clause of the policies; 6) no "bodily injury" or "property damage" has been alleged in the *Orleans Parish* action; 7) NL's claims are barred by the "pollution exclusion"; and 8) the damages and injuries asserted occurred outside the time period of the policies. CU also makes the following alternative arguments: 1) it needs discovery with respect to the issue of defense costs; 2) it is entitled to contribution from NL and the third-party defendants; and 3) NL is not entitled to attorney fees or costs accrued in bringing this motion.

## SCOPE OF DUTY TO DEFEND

■ Under New York law, an insurer's duty to defend, is "exceedingly broad." *Continental Cas. Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 648, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993). Where the insurer has promised to defend, coverage includes "litigation insurance" as well. *Id.* An insurer must defend whenever the complaint "suggests" that "a reasonable possibility of coverage" exists. *Id.* Thus, as long as the allegations in the complaint "fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be," the insurer must defend. *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 310, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984). When a complaint contains allegations that fall within that scope, and others that do not, the insurer still must defend, for the existence of "any facts or grounds which bring the action within the protection purchased" triggers the insurer's duty. *Continental*, 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506. Clearly, therefore, the duty to defend is broader than the insurer's obligation to indemnify. Accordingly, whether the insurer is eventually found liable for the claim itself is immaterial to the court's determination of the parameters of the insurer's duty to defend; the existence of claims that "may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay," leave "no doubt that it is obligated to defend." *Seaboard*, 64 N.Y.2d at 310–11, 486 N.Y.S.2d 873, 476 N.E.2d 272.

### 1. CU's Defenses Concerning NL's Alleged Knowledge of the Harm from Lead Paint

CU attempts to stave off summary judgment by arguing that 1) NL has committed

intentional torts not covered by the policies; 2) no "occurrence" within the meaning of the policies has occurred; and 3) lead poisoning was a "known loss" or "loss in progress." The Court will treat these arguments together because they are all premised on CU's assertion that NL's knowledge of the harm from lead paint relieves it of its duty to defend.

■ CU maintains that all four of the underlying cases in dispute are styled as intentional tort actions, and then cites several cases for the proposition that it has no duty to cover or to defend against intentional tort claims. *See, e.g., American Home Assur. Co. v. Diamond Tours & Travel, Inc.,* 78 A.D.2d 801, 433 N.Y.S.2d 116, 117–18 (1st Dept.1980). All of the complaints do contain allegations that NL has committed intentional torts in that it knew of the danger from lead paint. But, they also include allegations of negligence. The latter indisputably fall within the policies, and therefore CU has a duty to defend the entire actions. *Continental,* 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506.

Furthermore, even the cases that CU cites to support its position argue in favor of coverage here. For example, in *Brooklyn Law School v. Aetna Cas. and Surety Co.,* 849 F.2d 788, 789 (2d Cir.1988), the Second Circuit explained that under New York law "liability coverage depends upon whether the alleged injury was intentionally caused or was an unintended, although foreseeable, result of the alleged intentional conduct ... 'To deny coverage, then, the fact finder must find that the insured intended to cause damage.'" *Id.* (quoting *Continental Ins. Co. v. Colangione,* 107 A.D.2d 978, 484 N.Y.S.2d 929, 930–31 (3d Dept.1985)). Here, the complaints in the four new lead paint cases contain allegations that NL was aware of the potential danger from lead paint; they do not assert that NL intended to cause the alleged bodily injury and property damage which resulted. This Court need only determine that the underlying cases in question reasonably fall within the policies' coverage for CU to defend—and NL has more than met its burden. Indeed, CU's argument to the contrary borders dangerously on the frivolous.

■ Essentially the same argument is advanced by CU with regard to no "occurrence"—the policies extend coverage only to bodily injury or property damage "neither expected nor intended"; and no "known loss" or "loss in progress"—insurance coverage extends only to fortuitous events and harms which were not known before the inception of the policy. Again, the Court simply notes that "[a]s long as there exists any such basis for the duty to defend, the insurer is obligated to defend the underlying action in its entirety, despite the presence of uninsured allegations." *Agway Inc. v. Travelers Indemnity Co.,* 1993 WL 771008, at *17 (N.D.N.Y. December 6, 1993) (citing *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1204 (2d Cir.1989)). While the complaints may contain allegations that could be construed as no "occurrence" or no "known loss" or "loss in progress" within the meaning of the policies—and this Court does not so find—they also undoubtedly contain allegations which do not fall within these categories. Accordingly, CU is obliged to defend.

*2. CU's Defenses Concerning NL's Allegedly Deficient Notice and Failure to Cooperate*

■ CU claims that it need not defend because NL breached the notice provision as well as the cooperation clause of the policies. The policies require that when a "claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representatives." They also impose a duty upon NL to "cooperate with" CU. Both of these provisions were violated, CU maintains, when NL failed to provide notice of the underlying actions on a timely basis, and the duty to cooperate was further breached because NL retained counsel before notifying CU of the actions. Specifically, NL delayed providing notice to CU of the *Orleans Parish, Swartzbauer* and *Hurt* suits for one to two months, and delayed ten months before notifying it of the *City of Philadelphia* suit. The consequence of these alleged violations of the poli-

cies is that CU is relieved from its obligation to defend.

The Court disagrees. First, CU's argument that NL delayed one to two months, and in one occasion ten months, before providing notice is not so—CU arrives at these numbers by counting from the time the complaints were filed, rather than from when they were served upon NL. In fact, NL provided notice to CU within ten days to two weeks of receiving process in all of these actions. The four new lead paint actions are unlike, for example, auto accidents for which every moment of delay potentially prejudices the insurer; there, the insurer needs to examine the relative position of the cars and the condition of the road, so it can most accurately determine what transpired, as well as record statements from witnesses while memories are most fresh. Here, on the other hand, the claims asserted concern conduct by NL that spanned much of the twentieth century, and the knowledge of NL executives during that period. The timeliness of the investigation an insurer would have to perform to defend against these claims would not be quite so important. That does not mean that under no circumstances could NL have provided late notice thereby extinguishing its right to coverage. However, this Court concludes that the two week lag between NL's receipt of process and its notification to CU does not constitute a breach of the policies.

In addition, as NL notes, before these four lead paint cases had been served upon it, CU had already denied coverage on other lead paint actions on the ground that NL expected or intended the harm. A repudiation of liability by the insurer on the ground that the loss is not covered operates as a waiver of the notice requirements of the insurance contract and other conditions precedent. *H.S. Equities, Inc. v. Hartford Accident and Indem. Co.*, 661 F.2d 264, 270 (2d Cir.1981). Indeed, Professor Williston, in his treatise on contracts, explains the general doctrine whereby the performance of a condition is excused when it is obvious that the other party is not going to keep its promise to perform whether or not the condition is fulfilled. Williston on Contracts, Third Edi-

tion § 699 at 344–48. To illustrate this principle he states: "For instance, if an insurance company indicates that it is not going to pay an insurance loss in any event, the insured is excused from compliance with a condition requiring proof of loss, or arbitration or other preliminary acts." *Id.* at 349. Accordingly, this Court holds that CU's previous disavowal of coverage of lead paint claims against NL on the basis that NL engaged in intentional conduct served as a repudiation of coverage for the later claims as well, and thus excused NL's duty of timely notification of the claims in dispute here.

As to CU's argument that NL breached the "cooperation" clause of the policies by hiring outside counsel before CU was notified of the four suits, this too is without merit. Under New York law, it "is firmly established by the case law and commentators that where conflicts of interest between an insurer and its insured arise, such that a question of loyalty of the insured's counsel to that insured is raised, the insured is entitled to select its counsel, whose reasonable fee is paid by the insurer." *Emons Industries, Inc. v. Liberty Mutual Ins. Co.*, 749 F.Supp. 1289, 1297 (S.D.N.Y.1990). Here, the conflict between NL and CU is manifest: CU wants to establish that NL intentionally brought about the harm to the plaintiffs in the underlying suit to bring the claims without the policies; NL's interest is to prove the contrary. That NL hired outside counsel to represent it, under the circumstances, was reasonable, and does not constitute a breach of its duty to cooperate.

### 3. CU's Defense that Orleans Parish Contains Only Uncovered Claims

The policies at issue provide coverage for claims seeking damages for "bodily injury" or "property damage." CU maintains that the harms alleged in *Orleans Parish* do not fall within these terms, as the complaint avers that "the presence of lead based paint in the various school buildings owned by petitioner represents a potential hazard to the children who are students at these schools." Furthermore, this suit seeks the reimbursement or payment for abatement expenses taken or to be taken to prevent injury or

damage that has yet to occur. NL counters that such remedial costs do fall within the policies.

The Court of Appeals of New York has not addressed the breadth of the term "damages" in insurance contracts and whether it includes abatement costs. The Second Circuit, in *Avondale Indus. Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206–07 (2d Cir. 1989), was called upon to determine whether "damages" included the remedial costs of cleaning up a hazardous waste site. Because the policy did not define "damages," the Court, in accord with New York law, sought to divine the "natural and reasonable meaning" of the term, "corresponding to the 'reasonable expectation and purpose of the ordinary businessman.'" *Id.* (quoting *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983)). The Court, agreeing with the district court's conclusion, held that "damages" "include funds necessary for restoration of third parties' properties." *Id.*

■ *Avondale* is persuasive, although not controlling, because the disputed terms here are at least somewhat defined: "bodily injury" is "bodily injury, sickness or disease suffered by any person"; "property damage" is "injury to or destruction of tangible property." Moreover, the Court does find troubling NL's attempt to interpret "bodily injury" to encompass the *potential* bodily injuries alleged in *Orleans Parish*. But, the Court need not resolve the limits of "bodily injury," for it concludes that the abatement costs associated with the removal of lead paint from the schools in *Orleans Parish* constitute at least "property damage" under the policies. Indeed, damages "to real property have always been measured either by the cost to restore it to its former condition or to compensate for any reduction in value." *American Motorists Ins. Co. v. Levelor Lorentzen, Inc.*, 1988 WL 112142, *3 (D.N.J. October 14, 1988) (under New York law insurer liable for defense costs where underlying suit sought clean-up costs under CERCLA). The lead paint covering the schools in *Orleans Parish* is like graffiti: both reduce the value of the property by their mere existence and require an expenditure to be removed. Just as graffiti undoubtedly qualifies as property damage, so must the lead paint damage at issue here. Moreover, this Court need not conclude definitively that the *Orleans Parish* allegations are covered, but only that they "may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay." *Seaboard*, 64 N.Y.2d at 310–11, 486 N.Y.S.2d 873, 476 N.E.2d 272.

And, the Court's conclusion that the abatement costs may rationally said to be covered by the policy and require CU to defend means that CU must defend against the entire action, even though other claims may not be covered. *Continental*, 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506. Accordingly, the policy requires that CU defend the *Orleans Parish* action.

*4. CU's Defense that the Pollution Exclusion Bars Coverage*

■ Certain CU policies, those effective from January 1, 1970 to January 1, 1978, contain a pollution exclusion clause which states that the insurance does not apply:

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

CU claims that lead paint is a pollutant within the meaning of this clause, and that therefore coverage does not extend to the injuries and damages alleged in the underlying suits. NL asserts that lead paint can not be considered a pollutant and thus the exclusion does not apply.

"When an exclusion clause is relied upon to deny coverage, the insurer has the burden of demonstrating that the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and further, that the allegations, in toto, are subject to no other interpretation." *Technicon Electronics Corp. v. American Home Assurance Co.*, 74 N.Y.2d 66, 73–74, 544 N.Y.S.2d 531,

542 N.E.2d 1048 (1989) (citations omitted). This burden on CU, the minimal requirement that the claims against the insured reasonably fall within the policies' coverage, and the unresolved nature of the breadth of the pollution exclusion, lead this Court to conclude that CU must defend.

The Court of Appeals of New York has not addressed whether lead paint claims fall within the pollution exclusion, and there is a split among those lower New York courts which have. In *Oates v. State of New York*, 157 Misc.2d 618, 623, 597 N.Y.S.2d 550 (N.Y.Ct.Cl.1993), the New York Court of Claims found that "lead paint is a chemical and a contaminant that can irritate or poison," and thus fell within a pollution exclusion worded similarly to the one in dispute here. *Id.* On the other hand, in *Generali–U.S. Branch v. Caribe Realty Corp.*, 160 Misc.2d 1056, 1061–62, 612 N.Y.S.2d 296 (Sup.Ct.1994), a New York trial court granted summary judgment to an insured seeking a declaration that the insurer had to defend lead paint claims where the insurer sought shelter behind the pollution exclusion. That court relied in part upon the Massachusetts Supreme Court's analysis in *Atlantic Mutual Ins. Co. v. McFadden*, 413 Mass. 90, 92, 595 N.E.2d 762 (1992):

> There simply is no language in the exclusion provision from which to infer that the provision was drafted with a view toward limiting liability for lead paint-related injuries. The definition of "pollutant" in the policy does not indicate that leaded materials fall within its scope. Rather, the terms used in the pollution exclusion, such as "discharge", "dispersal", "release", and "escape", are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste.

*Id.*

This Court does not, now, hold that as a matter of law, lead paint is not a pollutant and therefore the pollution exclusion does not bar coverage. However, this Court agrees with *Generali–U.S. Branch* to the extent that there exists a "reasonable interpretation of the exclusion other than that it applies to claims based on lead poisoning—that the exclusion clause only applies to claims for injuries based on environmental pollution." *Id.* The presence of this reasonable interpretation, where the Court of Appeals has not spoken definitively, compels this Court to conclude that CU must defend these claims.

*5. CU's Defense that the Damages and Injuries in Question Occurred Outside the Time Period of the Policies*

■ The policies, which run from February 1, 1966 to January 1, 1978, provide coverage for "occurrence[s]" . . . which result, during the policy period, in bodily or property damage. CU contends that it has no duty to defend because the complaints contain allegations of damages outside the duration of the policy. NL argues that all four of the suits concern conduct and damages before, but also including, the policy period, and thus CU must defend entirely.

The Court agrees with NL. The complaints in question contain broad allegations spanning much of the twentieth century. And, "[i]f the allegations of the complaint are ambiguous or incomplete, the insurer is nevertheless obligated to defend if the case is potentially within the coverage of the policy." *Ogden Corp. v. Travelers Indem. Co.*, 681 F.Supp. 169, 172–73 (S.D.N.Y.1988) (citing *Commercial Pipe & Supply Corp. v. Allstate Ins. Co.*, 36 A.D.2d 412, 321 N.Y.S.2d 219, 221 (4th Dept.1971), *aff'd*, 30 N.Y.2d 619, 331 N.Y.S.2d 42, 282 N.E.2d 128 (1972)). The four underlying suits allege activity by NL which clearly encompass the period in which these policies were operable. Accordingly, because the Court concludes that the ambiguous allegations of the complaints are potentially within the coverage period, CU is required to defend.

*6. CU's Alternative Arguments*

*a. Request for Discovery*

■ CU argues that if this Court concludes that CU may have a duty to defend, it should be permitted to conduct discovery on this issue before a final judgment is entered. This request is denied. The standard under New York law for determining whether an insurer must defend is whether the allegations of the underlying complaints suggest

that a reasonable possibility of coverage exists. *Continental,* 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506. Because the Court must resolve this issue based on the four corners of the complaint, *id.,* additional discovery on the issue of the duty to defend would simply not assist the Court.

### b. *CU's Claim for Contribution*

CU seeks a declaration that it is entitled to contribution from NL. This is the same argument CU advances in its cross-motion for summary judgment, and will be addressed below.

### c. *CU's Argument that NL is Not Entitled to Attorney Fees in Connection With This Motion*

■ NL charges that it is entitled to recover its attorney fees in this action. CU maintains that under New York law, an insured may only recover such fees where it prevails after being put on the defensive by the insurer: because NL is the plaintiff, it is not entitled to attorney fees.

In *Mighty Midgets, Inc. v. Centennial Insurance Co.,* 47 N.Y.2d 12, 21, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979), the Court of Appeals of New York, in a case concerning an insurer's duty to defend, relied upon "the rule in New York that such a recovery [attorney fees in bringing the action] may not be had in an affirmative action brought by an assured to settle its rights, but only when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations." *Id.* (citations omitted). NL maintains that, nevertheless, this Court may, under New York law, still award attorney fees here because there has been an unreasonable, bad faith denial of coverage by CU. However, *Mighty Midgets* forecloses that option by making clear that New York law does not permit fee shifting in the circumstances presented here.[2]

■ For this reason, the Court also declines NL's invitation to award attorney fees under the Court's inherent power or under

28 U.S.C. § 1927. Only in the most egregious of cases would the Court, sitting in diversity, consider exercising its power as a Federal Court in contravention of a clear mandate from the highest court of the state whose law is applicable. Third Circuit case law suggests that under these circumstances this Court is, in fact, precluded from doing so. *See, e.g., First State Underwriters Agency of New England Reinsurance Corp. v. Traveler's Ins. Co.,* 803 F.2d 1308, 1318 (3d Cir.1986). NL's motion for attorney fees in connection with this action is denied.

## II. *CU'S CROSS–MOTIONS*

CU moves for summary judgment against INA and Lloyd's for contribution for past and future defense costs in the three original suits. Lloyd's has cross-moved for summary judgment against CU on its claim that it has no obligation to contribute. CU also moves for summary judgement against NL for contribution for defense costs in the old lead paint actions since March 1, 1992. In addition, CU moves for summary judgment against NL declaring that NL must pay its share of defense costs for non-covered claims in all seven underlying actions.

### *CHOICE OF LAW*

■ A federal court sitting in diversity must apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Therefore New Jersey choice of laws principles will determine which law governs the contribution claims asserted herein. New Jersey follows the flexible governmental interest analysis to resolve choice of law questions. *Pfau v. Trent Aluminum Co.,* 55 N.J. 511, 263 A.2d 129 (1970). However, "[i]n approaching the choice of law problem, the nature of the action must first be ascertained." *McBride v. Minstar, Inc.,* 283 N.J.Super. 471, 482, 662 A.2d 592 (1994). Here, all claims sound in contract. The New Jersey Supreme Court has adopted the Restatement standard—"significant contacts"—

---

2. In *New England Mut. Life Ins. Co. v. Johnson,* 155 Misc.2d 680, 589 N.Y.S.2d 736, 738 (Sup.Ct. 1992), which NL cites in favor of its argument, the Court did award attorney fees to the insured, but there the insurer was the plaintiff.

to determine which law governs contract claims. *State Farm Mut. Auto Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34, 417 A.2d 488 (1980). New Jersey looks to the jurisdiction "having the most significant relation and closest contacts with the occurrence and the parties." *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir.1982). The relevant factors to be considered are: the domicile of the parties, the place of contracting, the place of performance, the location of the subject matter, the reasonable expectations of the parties and the governmental and legislative interests of the states involved. Restatement Conflict of Laws (Second) § 188 (1988). While the place of contracting still has meaning, it is no longer the sole and determining criterion for choice of law purposes. *State Farm*, 84 N.J. at 37, 417 A.2d 488.

In *State Farm*, though, the New Jersey Supreme Court found that

> in an action involving the interpretation of an automobile liability insurance contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

*Id.* In *NL Industries*, 65 F.3d at 319, in which the Third Circuit reversed and remanded the earlier District Judge's decision to apply New Jersey, rather than New York law to the policies at issue here, the Court quoted the above passage from *State Farm*—although it omitted the qualifying: "in an action involving the interpretation of an automobile liability insurance contract...." *Id.* Nevertheless, the Court interpreted New Jersey law to require that in the ordinary dispute involving the interpretation of an insurance contract, a strong presumption should be accorded to the place of contracting when determining the choice of which law to apply. *Id.* In deciding whether this presumption should be overcome and whether

"the law of a state other than that of contracting has the requisite 'dominant relationship,'" courts are to consider the following factors:

(a) the needs of interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* at 320 (citing Restatement Conflict of Laws (Second) § 6(2) (1988). The Circuit Court also identified an additional consideration relevant in the context of our present dispute—namely, § 193 of the Restatement. "That section explains that, in the context of casualty insurance contracts, the application of the contacts articulated in § 188 and the concerns of § 6 should focus on determining which state 'the parties understood' ... to be the principal location of the insured risk during the term of the policy unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties." *Id.* (quoting *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Assoc. Ins. Co.*, 134 N.J. 96, 112, 629 A.2d 885 (1993)).

After a lengthy and detailed examination, the Third Circuit concluded that New York law applies to the coverage dispute over the CU policies for the lead paint actions. *Id.* at 324. This Court is bound by that determination. And New York law will be applied to the contribution claims asserted by CU against NL.

Although the Circuit's analysis is centered on CU's policies, the Court found that New York law was applicable to both the CU and INA policies.[3] *Id.* Absent from the opinion,

---

**3.** Although the Third Circuit's opinion did not expressly analyze the INA policies to determine which law to apply, clearly, New York law obtains. For at least 10 years, all of the INA policies at issue were continuously underwritten, negotiated, issued and delivered in New York

however, is a determination of the choice of law with regard to the policies issued by Lloyd's. Accordingly, this Court will now make the choice of law in the first instance.

■■■■■ Under New Jersey choice of law rules for contract actions, the first determination the Court must make is which forum qualifies as the place of contracting. *NL Industries*, 65 F.3d at 325. The scant facts presented to this Court in connection with this issue suggest that New York is the place of contracting, and also, the only state to have any interest in this dispute. The only relevant facts before the Court are: NL is incorporated in New Jersey, but, while the Lloyd's policies were negotiated and for the duration of those policies, NL's principal place of business was New York. Furthermore, NL's insurance brokers during this time, the Hamlin Company and later A & A, were located in New York, and both negotiated the Lloyd's policies. Lastly, many of the insurance policies which A & A negotiated on NL's behalf with the Lloyd's insurers also were delivered to New York. Accordingly, Lloyd's argues, New York was the place of contracting for these policies and therefore New York law governs. Significantly, none of the parties disagrees.

■■■■ Because this dispute concerns the interpretation of an insurance policy, New York law must obtain, unless a "dominant and significant relationship" with another state exists. *Id.* The first set of factors the Court must consider to resolve this question are: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Id.* Again, because so few facts have been presented on this issue, it is difficult to analyze these factors. The place of contracting and of negotiation, the Court has already concluded, was New York. There are no facts

which permit the Court to determine the place of performance, and given the nature of the policies at issue, the location of the subject matter of the contract is too metaphysical or universal to be divined. As to domicile, residence and place of incorporation: the Lloyd's insurers were presumably located in London, England; NL is a New Jersey corporation, but was headquartered, and conducted most, if not all of its insurance-related business in New York. The Court concludes that none of these facts suggests that a particular state enjoys a "dominant and significant relationship" to the policies sufficient to overcome the presumption that New York's law applies.

The second part of the choice of law analysis required by New Jersey law to determine whether "a dominant and significant relationship" with a state other than New York exists is to examine the interests described by § 6 of the Restatement establish. *NL Industries*, 65 F.3d at 325. Those interests are: 1) the needs of the interstate system; 2) the relevant policies of other interested states; 3) relevant policies of the forum; and 4) protection of justified expectations of the parties. *Id.* at 326–37. However, this Court need not, and indeed may not, make its own determination of these factors. In *NL Industries*, the Circuit Court analyzed these factors for the four new lead paint cases, and concluded that no state possessed an interest worthy of overcoming the presumption that New York law applies. *Id.* Although the Court did not make this inquiry as to the three original cases specifically, the analysis provided and conclusion reached are nonetheless fully applicable to them. Because this Court recognizes the conclusion by the Third Circuit—that no other state has a dominant and significant relationship to the four new suits—to constitute the law of the case concerning the original suits, this Court

City. NL was headquartered in New York City for most of this time. Alexander & Alexander ("A & A"), NL's insurance broker, was in New York. Together, NL and A & A negotiated and reviewed the insurance contracts in New York City. NL made its premium payments on the insurance contracts in New York City. More-

over, NL continued to buy its insurance policies in New York even after it ceased to be headquartered in New York. INA maintained and still maintains a New York City office that negotiated, executed, issued and delivered the INA policies at issue.

is bound thereby.[4] Accordingly, New York law will be applied to the interpretation of the Lloyd's policies.

### CONTRIBUTION AND DUTY TO DEFEND

■ Again, under New York law, the scope of an insurer's duty to defend is exceedingly broad; so broad, in fact, that the insurer must defend whenever the complaint "suggests" that "a reasonable possibility of coverage" exists. *Continental Cas. Co. v. Rapid American Corp.*, 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506. Where more than one policy is triggered by a claim, sharing of defense costs may be ordered. *Id.* at 655–56, 593 N.Y.S.2d 966, 609 N.E.2d 506. Courts may order that each insurer contribute equally, *Federal Ins. Co. v. Cablevision Sys. Dev. Co.*, 836 F.2d 54, 60 (2d Cir.1987), or on a pro rata basis. *Continental*, 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506.

1. *CU's Claims for Contribution Against INA*

■ The Settlement Agreement between NL and CU obligated CU to pay for defense costs incurred before March 1, 1992, for the three original suits. That Agreement preserved the subrogation and contribution rights of both parties. Accordingly, CU now seeks contribution from INA, whose policies—running from January 1, 1978 to August 1, 1989,—it argues, enjoy a reasonable possibility of applicability to the underlying suits.

INA argues, however, that as to the *Santiago* action, in which damages are being sought for lead paint poisoning which was diagnosed in 1973, there is no possibility of coverage; indeed, the INA policies began in 1978, five years after the alleged injury occurred. The Court agrees. INA's policy is triggered by an "occurrence", which it defines as an "event including injurious exposure to conditions, *which results during the policy period* in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." Because the infant for whom damages are being sought in *Santiago* was diagnosed with lead paint poisoning five years before coverage under the INA policies began, the injury was not sustained "during the policy period." Accordingly, CU's motion for summary judgement to share defense costs of *Santiago* with INA is denied.

■ With regard to *HANO*, CU argues that the complaint is silent as to when the alleged injuries manifested or occurred. Therefore, there exists a reasonable possibility of coverage under the INA policies, requiring INA to contribute. INA contends that the lead to be abated is contained in paint which was applied to the walls and other areas before the 1970's, well before the INA policies were in effect. Here, CU has the better argument, for the *HANO* complaint contains broad, general allegations, but includes no specific allegations of when the paint was applied. Consequently, there is a reasonable possibility that the *HANO* claims are covered by the INA policies, and thus summary judgment with regard to this suit is granted.

■ CU also premises its claim for contribution from INA for the *City of New York* action on the lack of specificity of the underlying complaint. INA seems to concede that it is liable for defense costs before December 23, 1991, when all claims were dismissed except for those sounding in fraud; afterwards, it proffers, the sole (intentional tort) claims remaining do not fall within the scope of the policies. Under New York law, though, an insurer's duty to pay defense costs is not relieved where the complaint alleges that the insured intended its conduct, but only where it is alleged that the insured intended the harm. *Brooklyn Law School v.*

4. Arguably, the last factor of § 6 of the Restatement, the protection of the justified expectations of the parties, was not determined in *NL Industries* as to the Lloyd's policies because the Court discussed this factor with regard to the CU policies only. Nevertheless,· the Court's conclusion that it was reasonable to assume that the parties reasonably expected New York law to apply—because all parties to the contracts knew at the time of the signing the general rule that the law of the state in which the contract was formed governed the contract—is also true with respect to the Lloyd's policies. *NL Industries,* 65 F.3d at 327.

*Aetna Cas. and Surety Co.*, 849 F.2d at 789 (quoting *Continental Ins. Co. v. Colangione*, 107 A.D.2d 978, 484 N.Y.S.2d 929, 930–31 (3d Dept.1985)). Here, the *City of New York* complaint does not assert that NL intended to cause the bodily injury and property damage that allegedly occurred. Thus, INA's duty to defend in *City of New York* spans the entire life of the suit. CU's summary judgment motion for contribution is granted.

2. *CU's Claims for Contribution Against NL Based on NL's Periods of Self–Insurance*

CU maintains that it is entitled to seek contribution from NL for defense costs, relating to the three original actions for the periods that NL was self-insured—before 1946 and after 1989. NL responds that under the New York Court of Appeal's decision in *Continental*, 80 N.Y.2d at 655–56, 593 N.Y.S.2d 966, 609 N.E.2d 506, this motion is premature, and thus summary judgment must be denied.

In *Continental*, the Court of Appeals determined that the primary insurer was liable for defense costs arising out of asbestos-related claims against the insured. *Id.* at 655, 593 N.Y.S.2d 966, 609 N.E.2d 506. However, the Court ruled that that insurer's claim for contribution from another insurer, and from the insured itself for periods in which it had been self-insured, was premature. The Court stated that: "When more than one policy is triggered by a claim, pro rata sharing may be ordered, but we perceive no error or unfairness in declining to order such sharing, with the understanding that the insurer may later obtain contribution from other applicable policies." *Id.* Moreover, "the question of whether the insured itself must contribute to defense costs—an issue on which courts have divided—is appropriately deferred at least until such time as the underlying lawsuits are shown to involve 'occurrences' during self-insured periods." *Id.*

As NL argues, *Continental* seems to suggest that an insurer may not obtain contribution from an insured for periods of self-insurance until the underlying suits ripen sufficiently to enable the insurer to prove

that there were "occurrences" within the self-insurance period. This Court finds this apparent holding disturbing, particularly because the Court of Appeals' absence of explanation. One possible rationale is that, given the broad duty to defend imposed upon insurers under New York law, the Court of Appeals may have encouraged delayed apportionments to ensure that that broad duty was not undercut. On the other hand, the duty to defend standard requires only à reasonable possibility that the claims asserted fall within the relevant policy; thus, when the allegations of a complaint arguably apply to periods covered by insurance policies as well as to periods of self-insurance, it would seem that an insured, like the insurer, must be obligated to pay for its share of these costs, up front. Furthermore, because the duty to defend is triggered by an examination of the "four corners" of a complaint only, *Continental*, 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506, there seems to be no need for a delayed apportionment of costs.

In any event, this Court does not read *Continental* to preclude it from ordering, now, an apportionment of defense costs among the insurers and NL for the original lead paint cases. Indeed, even under NL's reading of *Continental*, apportionment would be appropriate at this time. NL has been dismissed from both *Santiago* and *HANO* on procedural grounds, and only fraud claims remain in *City of New York*. Thus, the Court can not expect those suits to progress to a point where it can be more readily determined whether there were "occurrences" during the periods of self-insurance. Finally, the sweeping nature of the complaints in question present a reasonable possibility that the claims asserted do fall within that period. Accordingly, NL must contribute to its own defense costs, post March 1, 1992, and CU's motion for summary judgment is granted.

3. *CU's Claim for Sharing Defense Costs With NL Due to Uncovered Claims*

CU further argues that NL must share in the costs of defending all seven underlying suits for the uncovered claims asserted therein, and relies upon *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d

1178 (2d Cir.1995). There, the Second Circuit upheld a pro-rata sharing scheme for liability coverage, which included the insured for self-insured periods. CU then contends that there is no difference between periods of self-insurance, for which NL clearly must contribute, and claims asserted against the insured that are simply not covered by an otherwise operable policy.

■■■■ While this argument is logical, and indeed may even be persuasive, it does not accurately represent the law of New York. Where a complaint contains covered and un-covered claims, the insurer has to defend the entire action. *Agway Inc. v. Travelers Indemnity Co.*, 1993 WL 771008, at \*17 (N.D.N.Y. December 6, 1993) (citing *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir.1989)). Thus NL need not share in the costs of its defense in any of the seven suits based on the presence of claims that do not fall within any of the policies. Accordingly, CU's motion for summary judgment with respect to this claim is denied.

4. *CU's Claim for Contribution Against Lloyd's, and Lloyd's Motion for Summary Judgment with Respect to this Claim*

CU moves for summary judgment on its claim for contribution against Lloyd's for defense costs for *HANO* and *City of New York.* Lloyd's cross-moves for summary judgment on the grounds that it has no duty to defend either action.

The dispute between these two insurers can be pared down quickly. The Lloyd's policies covered property damage only, and were in effect from November 19, 1949 to May 1, 1970. However, the only policies covering product liability[5] claims are those issued from May 1, 1958 to May 1, 1970. The Lloyd's policies issued before May 1, 1958, therefore, clearly do not cover *HANO* and *City of New York,* which are products

liability suits. Indeed, CU concedes as much. See Reply Brief of CU in Support of Its Motion for Summary Judgment and in Opposition to Lloyd's Motion for Summary Judgment, at 7. Furthermore, the CU and Lloyd's policies overlapped from February 1, 1966 to January 1, 1970: during this period, CU's policies provided bodily injury coverage and Lloyd's provided coverage for property damage. Lloyd's argues that it has no duty to defend for this period because the policies do not cover the same risk, *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.,* 461 F.2d 500, 503 (2d Cir.1972), or, because if the two do cover the same risk, than the "excess" insurance clause in its policy relieves it of any obligation to cover and to defend. While the Court does not reach a conclusion as to which of these arguments is correct, it does acknowledge that under either scenario, Lloyd's has no duty to defend for the duration of the overlap of the policies.[6]

Thus, the Court need only resolve whether Lloyd's must contribute to NL's defense costs for *HANO* and *City of New York* from 1958 to 1966 when it was NL's sole insurer, providing coverage for property damage arising from product liability claims. The applicable arguments that Lloyd's proffers to support its position that it has no duty to defend are: 1) the two policies do not cover the same risk; 2) there was no "occurrence" within the policy period; and 3) no property damage occurred.

■■■■ Lloyd's argues that where two insurance policies apply, one insurer can seek contribution from the other only where the policies cover the same risk. Indeed, this proposition of law is correct. *See, e.g., Seaboard Shipping,* 461 F.2d at 500. Lloyd's then argues that it does not have to contribute because its policies covered only property damage whereas CU's covered bodily injury and property damage. Lloyd's argument fails to appreciate a subtle distinction—both

---

5. It should be noted that these product liability policies only insured against property damage.

6. CU argues that it is possible that, if the Court determines that the two policies do not cover the same risk, then the "excess" clause would not preclude Lloyd's from having to contribute because that clause would not apply. It premises this claim on the meaning of the word "collectible" in the Lloyd's policies. The Court simply notes that it does not understand CU's position; moreover, the Court finds the "excess" clause in Lloyd's policies applicable to the extent that the two sets of policies do not cover the same risk.

policies do cover the same risk because both provide coverage for property damage which occurs *during their respective policy periods.* Lloyd's argument is essentially that CU, whose policies are triggered by the underlying suits and who therefore must defend, may not obtain contribution from Lloyd's because its policies, which were in effect at a different time and also triggered by the underlying suits, do not cover exactly the same risk as CU's policies. This argument has no merit.

■ Lloyd's also seeks to evade contribution by maintaining that there was·no "occurrence" within its policies which would obligate it to defend. Specifically, it posits that coverage is triggered only by an "occurrence," which is defined in the policy as a single event or originating cause. And, because the sale of lead paint is the "occurrence," and because lead paint was sold as early as the 1920's, there was no occurrence within the time period of the Lloyd's policies. In the alternative, it contends that the allegations in *HANO* and *City of New York* are insufficient to trigger coverage because under the "single event" or "originating" cause definition of "occurrence," only the first application of the lead paint would constitute an occurrence, and the complaints do not state when the paint was applied. These arguments are also disposed of easily. The Court does not interpret the Lloyd's policies as adopting a "single event" or "originating" cause definition of occurrence. Indeed, in the full definition of "occurrence" relied upon by Lloyd's reads: "The term 'one occurrence' shall be taken to mean a single event, or originating cause *and shall include all resultant or concomitant loss or losses* whether to one or more locations." Clearly "occurrence" does mean the single event, but as the policy states, it includes all losses that flow from that event. Regardless of what the "triggering event" is held to be—and the Court makes no legal determination on that issue—the policy is triggered as long as the harm continued during the Lloyd's policies. The Court also holds that, in the alternative,

the complaints broadly allege property damage from lead paint, and do not include allegations as to when the paint in *HANO* and *City of New York* was purchased or applied. There exists a reasonable possibility that either or both of these events "occurred" while the Lloyd's policies were in effect, thereby requiring it to defend.

Finally, as to Lloyd's argument that it has no duty to defend because *HANO* and *City of New York* seek abatement costs and therefore no property damage has occurred: the Court concluded above that CU has to defend the *Orleans Parish* action because the abatement costs associated with the removal of lead paint from the schools in that case constitute, at a minimum, "property damage" under its policies. *See, e.g., American Motorists Ins. Co. v. Levelor Lorentzen, Inc.,* 1988 WL 112142 at \*3. The Court's holding with regard to the *Orleans Parish* allegations is arguably the law of the case for the Lloyd's policies at issue here. In any event, for the same reasons, the Court concludes that the *HANO* and *City of New York* claims "may rationally be said to fall within policy coverage, whatever may later prove to be the limits of the insurer's responsibility to pay." *Seaboard,* 64 N.Y.2d at 310–11, 486 N.Y.S.2d 873, 476 N.E.2d 272. Consequently, Lloyd's has a duty to defend these two actions.

Accordingly, CU's motion, and Lloyd's cross-motion for summary judgment are granted and denied to the extent that Lloyd's must contribute to NL's defense costs for *HANO* and *City of New York* under its policies in effect from 1958 to 1966.

5. *Method of Apportionment*

■ The Court has determined that defense costs should be apportioned among CU, INA, Lloyd's and NL[7] with regard to the *City of New York* and *HANO* actions, and among CU and NL with respect to *City of New York, HANO,* and *Santiago.* ˙ This Court concludes that the preferred method of sharing would be on a pro-rata basis—so that each party pays only for its fair share of the defense costs. However, the parties have presented no formula for allocating costs in

---

**7.** NL must contribute only as a self-insurer, and not based on the existence of non-covered

claims.

this manner, and no obviously equitable method appears to exist. Indeed, because liability for defense costs is premised on the four corners of the complaint, and because many of the underlying complaints are unspecific, allocation based solely on the duration of each parties' insurance policy, (or lack thereof), and degree of risk assumed, may be the only equitable basis of apportionment.

The Court orders that the parties contact Magistrate Judge Pisano forthwith for a determination as to how the defense costs should be allocated.

## CONCLUSION

For the reasons stated, NL's motion for summary judgment against CU for defense costs relating to the four new actions, is granted; CU's motion for summary judgment with respect to defense costs against INA is denied for defense costs arising from *Santiago,* but granted with respect to defense costs arising from *HANO* and *City of New York;* CU's motion for summary judgment against NL for contribution after March 1, 1992 arising from the three original lead paint claims is granted; and CU's motion for summary judgment against Lloyd's, and Lloyd's cross-motion for summary judgement, are granted and denied to the extent that Lloyd's must contribute to the defense of the *HANO* and *City of New York* actions under the Lloyd's policies from 1958 to 1966.

## ORDER

This matter having been brought before the Court on plaintiff NL Industries, Inc. ("NL") motion for summary judgment against defendant Commercial Union Insurance Company ("CU"); on CU's cross-motions for summary judgment against NL, and third-party defendants Certain Underwriters at Lloyd's ("Lloyd's"), and Insurance Company of North America ("INA"); and on Lloyd's cross motion for summary judgment against CU; for reasons stated in the accompanying opinion, it is on April 30, 1996 hereby ORDERED that:

1. NL's motion for summary judgment against CU for defense costs relating to the four new actions, is **granted;**

2. CU's motion for summary judgment with respect to defense costs against INA is **denied** for defense costs arising from *Santiago,* but **granted** with respect to defense costs arising from *HANO* and *City of New York;*

3. CU's motion for summary judgment against NL for contribution after March 1, 1992 arising from the three original lead paint claims is **granted;**

4. CU's motion for summary judgment against Lloyd's, and Lloyd's cross-motion for summary judgement, are **granted** and **denied** to the extent that Lloyd's must contribute to the defense of the *HANO* and *City of New York* actions under the Lloyd's policies from 1958 to 1966; and

5. all parties must contact Magistrate Judge Pisano forthwith for a determination of the allocation of defense costs.